The Honorable Judges of the United States Court of Appeals came in for the subject of judicial circuit. Hear ye! Hear ye! Hear ye! All persons under business before this Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and this Honorable Court. Good morning, everyone. We're going to start today with the case 24-2794, 37 Celsius Capital Partners v. Intel Corporation. We will hear from the appellant. Good morning. May it please the Court, my name is Gabriel Gray-Hick and I represent 37 Celsius, the plaintiff's appellant in this case. In our opening brief, 37 Celsius states a number of points, all of which we believe merit your attention. But the utterly decisive one, and the one that I would like to address first, is the fact that the term sheet signed between the parties is a Type II agreement under Delaware law. When New York federal courts first developed this framework for analyzing preliminary agreements, they distinguished between two different types. The first type occurs where the parties have reached a complete agreement on all major terms, including the agreement to be bound. It merely contemplates memorializing a more polished form or a formal document at a later date. The second type, and what we have here, is a Type II agreement. It expresses mutual commitment to a contract on agreed major terms. With regard to determining whether an agreement is a Type I agreement, Type II agreement, or none of the above, is there any one dispositive factor, or are we to consider the entire agreement and read it in its totality? You have to read the entire agreement and read it in its totality. The most important thing is that the parties have to agree to negotiate, and the parties here agreed to negotiate, and they even went a step further. They agreed to negotiate exclusively. And the district court erred in its determination that the term sheet was not a Type II agreement. But just so I understand, the exclusivity agreement is not what makes this a Type II agreement. Is that correct? That's correct. So it is some, according to your client, what makes this a Type II agreement is some agreement to continue negotiating in good faith to the final agreement. Correct. And it's important to note that a number of the major terms were already agreed to. The parties laid out a detailed framework for final transaction by which 37 Celsius would acquire a 70% ownership stake in CARE for an investment of $12 million. The Intel would retain 15%, and 15% would be reserved for future stock options or equity bonuses. But to return to the district court's finding, the district court erred because it stated that there was no express agreement to negotiate in good faith. But the absence of a good faith provision is no impediment to the formulation or the formation of a Type II contract. To be sure, Type II agreements, they do sometimes acknowledge that the parties wish to state in definitive terms that they agree to a duty to negotiate in good faith. But while that express good faith clause is a relevant factor in identifying a Type II agreement, it might even be a sufficient factor to create a Type II agreement. It's not a necessary factor. So if we are to look at the entire agreement, I'm talking about the term sheet now, and the exclusivity provision is not what gives rise to your client's argument that this is a Type II agreement. What are we to do with the language in the no binding agreement paragraph that, quote, neither this term sheet nor its acceptance shall give rise to any legally binding or enforceable obligation on any party, except with regard to, and it notes specific sections, including the exclusivity section. That seems to be a pretty express disclaimer of any other legal obligation other than those expressly enumerated. So I was wondering what your response to that is. Well, it's important to realize where a preliminary agreement is in the negotiating stage, and it's not uncommon for preliminary agreements to contain non-binding terms. The term sheet in SIGA, for example, contained a non-binding provision. So did the term sheet in Cambridge Capital. The non-binding terms specify that this agreement can't be used to enforce the final transaction, namely the closing of the transaction between Intel and 37 Celsius. But those binding provisions, and in the term sheet, the binding provisions outlined were the governing law provision, third-party beneficiary provision, confidentiality, and the exclusivity provision. So the parties did agree to be bound by this exclusivity provision in the term sheet. But that's, I guess, I understand your point. I guess my concern is that the confidentiality, the exclusivity, governing law, third-party beneficiaries, those refer to provisions in the term sheet, not provisions in some future agreement. And so I wonder whether in context that provides additional meaning to, or at least explains what the parties intended when they say that other than those, the document gives rise, that is the term sheet, gives rise to no other legally binding or enforceable obligation. Well, that's precisely the point. Here, Intel breached the exclusivity provision that the parties agreed to be bound by. And the exclusivity provision specified that Intel would solely negotiate with 37 Celsius for the closure of care. But I thought you said that the exclusivity agreement is not what gives rise to the good faith obligation on which you're relying on this case. The exclusivity clause gives rise to the – breaching the exclusivity clause is a component of the breach. The breach here – let me restate. The breach here was where Intel negotiated outside of the exclusivity clause with a company named IC. Every Type 2 agreement carries with it a duty or an obligation to negotiate in good faith. Whether or not that Type 2 agreement specifies that it's non-binding on specific terms. If we look at the term sheet in SIGA, for example, that also contained a non-binding clause. I understand. I guess I'm trying to, in my mind, distinguish between – and you can correct me if I'm wrong – but distinguish between a breach of the exclusivity agreement and a breach of the agreement to negotiate in good faith to a final agreement. It seems to me that those two, while related, they're separate legal obligations, separate breaches. The breach of the exclusivity provision perhaps or perhaps not being limited to reliance damages versus expectation damages, which is what your client is seeking. And so that's where I think the briefing sometimes gets muddled, and understandably so, with regard to the obligations on the exclusivity provision and the, I would say, for lack of a better word, implied duty of good faith negotiation. But it seems to me that those are two separate obligations. Am I wrong about that? I think the court needs to look at the SIGA and the Cambridge capital cases. Both of those cases contain non-binding provisions. No, no, but I'm not talking about non-binding provision. I'm talking about whether the obligations under the exclusivity provision are separate and independent from – separately and independently enforceable or actionable compared to the obligation under the implied duty of good faith to negotiate to a final agreement. They are separate, Your Honor, and the exclusivity provision isn't in every single Type 2 agreement. But a duty or an obligation to negotiate in good faith is in every Type 2 agreement. So a breach of the exclusivity provision in and of itself doesn't get you to where you want to go, which is expectation damages. At least that's not what you're relying upon, right, for the expectation damages. Well, it's certainly a large part, and breaching that – No, no, I understand, but that in and of itself is not what you're relying upon to seek expectation damages. It's the other breach. It's breaching the exclusivity provision within the context of this overall obligation to negotiate. It is not the sole – so the breach of the obligation to negotiate in good faith isn't the sole aspect or factor that determines that Intel breached this agreement, but it is the breach of that duty that gives rise to expectation damages. And the breach of the exclusivity clause is Intel's breach of the obligation to negotiate in good faith. And the exclusivity clause specifies that it will only be negotiating with 37 Celsius. It won't accept offers from other companies, and it won't close on a transaction with other companies, all of which it did by March 1st. Counsel, why doesn't any such duty end when your clients don't come up with the funds prior to the agreed-upon closing date, and Intel sends a notice saying it shall not close? The letter from Intel only noted that the closing event shall not occur. And I think this is important. The district court used the termination provision to distinguish this contract from other Type 2 contracts, but that's in error. The other contract or other Type 2 agreements also contain termination provisions. What SIG has specified is that a company, as a party to a Type 2 agreement, can't arbitrarily denounce the deal and back away from that deal. But that's not what's in the term sheet. The term sheet outlines three specific ways that Intel could have backed out of this deal. Number one, it could have closed on a final transaction with 37 Celsius, which it didn't do. It could have had a written termination or a written agreement to terminate the term sheet between Intel and 37 Celsius, which it didn't do. And the third option is that it could have delivered written notice of termination to 37 Celsius terminating the deal, which it also didn't do. And that letter only identified that that closing event specified on February 14th was not going to occur. After that date, Intel continued to negotiate with 37 Celsius in direct contradiction to what they've claimed that letter was. So at no point was there any termination of this term sheet. And so the binding exclusivity provision duty, the obligation to negotiate in good faith, continued until they had closed and eventually breached with IC on March 1st. But the specific term of the closing date didn't apply. Correct. Correct. The specific term of the closing date was not one of those binding provisions. And I think that gives credit to the fact that that termination or the letter did not terminate the term sheet between the two parties. And after that, February 14th, even though that date was outlined within the term sheet, because it's not in the binding provisions, it can't be enforced as a deadline or a termination date or anything like that. Did 37 Celsius actually have the necessary funds by February 14th? Well, 37 Celsius didn't have the necessary funds by February 14th. But it is a disputed fact whether or not they would have had those funds at a later date. And the district court erred in determining on summary judgment. Let me back up one step. The district court determined that the termination provision, a contractual interpretation, precluded it from finding that 37 Celsius could have closed on the deal between February 14th and March 1st or at a later date. But that's a contractual interpretation. There's still a material disputed fact here that shouldn't have been dealt with on summary judgment that 37 Celsius could have closed. There is evidence in the record that accounting for the funds already gained or the funds already committed to 37 Celsius and Alexander Kempe's own funds that he could have closed on this deal at a later date. But again, that's a material fact distinction that should not have been dealt with on summary judgment. I'd like to return to the district court's holding on its motion for reconsideration. I'd like to quote just one section because I think it really distinguishes the fact that the district court erred here. It stated that, above all, it's unclear that Cox holds, as 37 Celsius argues that it does, that the absence of an express good faith provision is no impediment to the formation of a Type 2 contract. But that directly contradicts what the court in Cox stated and it directly contradicts what the courts in Delaware have, how the Delaware courts have applied Cox since that decision, specifically in the Greentech Consultancy Company case. In that case, it stated, quote, the agreement in Cox communications similarly did not contain an obligation of good faith. Still, the Supreme Court recognized it as a Type 2 preliminary agreement. The lack of an express good faith obligation, therefore, does not hinder this court's conclusion that the term sheet is a Type 2 preliminary agreement. I think that goes in direct contradiction to what the court, the district court stated, and I think that this court can reverse and remand on that basis alone. Can you address the hold harmless provision in the nondisclosure agreement? The hold harmless provision in the nondisclosure agreement merely applied to the nondisclosure agreement. So the hold harmless clause states that under no circumstances will either party be liable to the other for any costs or damages of any kind in connection with not moving forward to the conclusions of the discussions or negotiations. Now, the hold harmless clause in a nondisclosure agreement only applies to the disclosure of private or privileged information. Within the nondisclosure agreement itself, when Intel and 37 Celsius later stated that the term sheet was subject to the NDA. But that's not what the language seems to indicate. The language seems very broad, right? Under no circumstances will either party be liable to another for any costs or damages in connection with not moving forward to the conclusion of the discussions or litigation or negotiation. It doesn't say in connection with the breach of the nondisclosure agreement or the improper disclosure of any confidential information. Well, the term sheet only mentions or only refers to the nondisclosure agreement within the confidentiality section of the term sheet. And so when the parties agreed to the term sheet, they agreed that it is subject to the nondisclosure agreement, meaning the agreement itself is confidential. But it doesn't then incorporate all the limitations of the previous nondisclosure agreement into the term sheet. And the most important point, the NDA is explicitly limited in its reach. Under Section 13E, any other agreements between the parties, including the nondisclosure agreements, will not be affected by this agreement. In the nondisclosure agreement, the parties agreed that Intel and 37 Celsius agreed to the nondisclosure agreement, agreed to nondisclosure of private or privileged information to the public. But subsequent agreements would not be affected by the nondisclosure agreement. Is that what that provision really means? Because it's in the context of the integration clause, right, 13E? And when it says any other agreements between the parties, does it mean any existing agreements won't be affected by this agreement? Or I guess you're reading it to mean any future agreements. And where does that reading come from? Any future agreements, specifically in that Section 13E, that any other agreements between the parties will not be affected, including other nondisclosure agreements. Your Honor, I do want to answer all your questions, but I do wish to reserve the rest of my time for rebuttal. I'll give you enough time. If you can go ahead and answer the question. The nondisclosure agreement specifies that it won't affect future agreements. And I think that the Court should look at the term sheet for the provision that the confidentiality section refers to the nondisclosure agreement as a confidentiality agreement. It doesn't refer to it as a previous agreement. It refers to it as a confidentiality agreement, so that release of private or privileged information should be subject to the nondisclosure agreement, not the incorporation of all limits of liability from the NDA or any previous agreement. Thank you, Counsel. Mr. Grahek, we'll give you four minutes on rebuttal. All right. Now we'll hear from the appellees. Mr. Splitek? Splitek, yes. Splitek. Good morning. I'm Matt Splitek here for Intel Corporation and CARE Innovations, LLC. 37 Celsius cannot recover damages that it waived to compensate for the value of a transaction that it had no right or even ability to close. 37 Celsius was a private equity fund represented by two elite law firms, and it began its negotiations with Intel by explicitly waiving Intel's potential liability for lost profits if the negotiations did not result in a deal. Two weeks later, it then accepted a term sheet in which Intel did not assume any obligation to negotiate a final agreement with 37 Celsius and instead explicitly reserved its right to pull the plug after only two days. When Intel nonetheless stood ready to close the transaction on the term sheet's closing deadline, it turned out that 37 Celsius did not have the money anyway. And now here, 37 Celsius not only wants to be paid as if it did close the transaction that it did not have the money to close, it wants access to the exact same damages remedy that it waived at the outset of its discussions. Mr. Splitek, a preliminary question. There was some discussion today about whether or not Intel's letter terminated the term sheet, the letter that says closing shall not occur. I understand that for the purposes of the summary judgment motions, Intel admitted that that letter did not terminate or that it did not terminate the term sheet. I guess I'm referring to its docket 42, paragraph 2723. Is that correct? Your Honor, it is partially correct because there were two motions for summary judgment. So for purposes of the initial motion for partial summary judgment solely on the lost profits claim, Intel conceded that for purposes of that motion. But in the district court's September 2024 decision, the district court held that Intel did terminate the term sheet by written notice and the district court can be affirmed simply on the basis of waiver on that particular issue because in its opening brief, 37 Celsius did not develop an argument in support of reversing the district court's September 2024 ruling that Intel terminated the term sheet and therefore did not breach the term sheet when it sold CARE to IC. So you're saying that Intel assumed for the purposes of the first summary judgment motion that it did not terminate the term sheet, but for the second one, that was an issue that was disputed and up for grabs. Yes, in the second motion, one of our primary arguments was that Intel terminated the term sheet and the district court agreed with us. I want to go to the Type 2 issue because it took up a lot of the airtime during the first session. To determine whether the term sheet imposed an obligation on Intel to negotiate a final agreement with 37 Celsius, which is the first of SIGA's two requirements, the court must look only to the four binding provisions of the term sheet, as Judge Lee, I think you indicated to some extent. On pages 29 and 30 and footnote 9 of our answering brief, we cite different cases that gave effect to parties' decisions to designate which provisions are binding and which are not. The Brown v. Cara case that 37 Celsius relies on, on page 157 of that decision, also held that a court must enforce a preliminary agreement only to the extent that the parties intended to be binding. So only the four binding provisions are on the table and none of them imposed an obligation on either 37 Celsius or Intel to negotiate a final agreement in good faith or otherwise. My colleague talked about the non-binding footer in SIGA. I disagree with that characterization. If the court looks at pages 345 and 346 of SIGA, the SIGA court dealt with that issue explicitly. And it said that although the term sheet, they called it the lance, is not signed and contains a footer on each page stating non-binding terms, the record supports the vice chancellor's factual conclusion that incorporation of the lance, the term sheet, into the bridge loan and merger agreements, which are both fully binding agreements, reflects an intent onto the part of both parties to negotiate toward a license agreement with economic terms substantially similar to the terms of the term sheet. And in those fully binding agreements, the parties in SIGA, they explicitly agreed to negotiate in good faith in accordance with that term sheet. They made that binding commitment that is absent in the term sheet here. So the SIGA court identified the non-binding footer as very much an obstacle that was overcome by the fact that the parties had reached their agreement in fully binding agreements. The SIGA court would not have held for pharmathene if the only preliminary document on the table had been the non-binding term sheet itself. I also disagree with the characterization of Cambridge Capital. The court looks at pages 443 through 445 of that decision. The Cambridge Capital court was very specific in analyzing the terms of the no-binding provision. In that case, it found it to be very weak. It specifically contrasted the no-binding provision in that case with a provision that disclaims any obligation. And even finding the no-binding provision in that case to be very weak on pages 446 and 448, the Cambridge Capital court, all it held was that the agreement was ambiguous and it could plausibly be read to be a type two preliminary agreement at the motion to dismiss phase. Here, we have exactly the language that was lacking in Cambridge Capital. The court already pointed my colleague to the no-binding agreement section. In addition, there is the no-reliance section of the term sheet. And there, after in the no-binding agreement section, disclaiming any legally binding or enforceable obligation except in the four binding provisions, in the no-reliance section, they also disclaimed any legal obligation of any kind whatsoever regarding any transaction except for the matter specifically agreed to in this term sheet. The disclaimers could not be more clear. And that distinguishes this case quite easily from Cambridge Capital. And lastly, regarding Cambridge Capital, I will point out as we did in our answering brief, in the second Cambridge Capital decision, the Cambridge Capital concluded that expectation damages were not available anyway, because putting expectation damages on the table would violate the party's reasonable expectations ex ante. That decision in Cambridge Capital aligns with one of the district court's rulings here, and 37 Celsius, in its reply, did not reply to our argument in our answering brief that the district court correctly ruled that even setting aside all the other arguments on the Type 2 Preliminary Agreement issue, the term sheet cannot be deemed a Type 2 agreement because it would violate the party's reasonable expectations ex ante. Mr. Splitak, one of the provisions that appellant cites in the term sheet is the language under timing section. Quote, the parties will work to close the transaction as quickly as possible after signing, subject solely to the receipt of a third-party consent set forth in Exhibit B. According to 37 Celsius, that evidences an intent for the parties to work in good faith to close the transaction. How do you respond to that argument? It evidences, Your Honor, that provision is non-binding. It is explicitly non-binding, and 37 Celsius and Intel's decision to make it explicitly non-binding evidences their intent to not bind themselves to any obligation stated in those words. The fact that those words appear in explicitly non-binding provisions supports us, not 37 Celsius. It would have, having written those sentences in the term sheet, if 37 Celsius and Intel wanted to commit themselves to obligations in those provisions, all they had to do was add the title of that section to the no-binding agreement section, to the list of sections that would be binding. And they did not do that because they did not intend to assume any obligation to negotiate a final agreement. Well, you know, I guess I understand that argument. But the other non-binding provisions, the proposed transactions, you know, the contribution of each company, the cash contributions, equity contributions, forgiveness of debt, those are all terms that the parties kind of loosely envision would frame the final document. So they're what I would call kind of forward-looking provisions. The timing provision, though, isn't really forward-looking. It talks about what the party is going to do now. That is, the parties will work to close the transaction as quickly as possible. Your argument seems to be that even if Intel completely disregarded that obligation, that 37 Celsius, that basically that obligation is meaningless given the language in the non-binding provision. And is that the position that Intel is taking, that whatever words are in the timing provision that talks about what the parties are going to do now, that it was just kind of, I don't know, meaningless? I would not call it meaningless, Your Honor. Well, then how is it meaningful? Because it expressed the parties' intent while at the same time the parties were deciding that it would not give rise to any enforceable obligations. So it was, I would say that it is not, that language is not enforceable. And that was clearly their intent. But I wouldn't go so far as meaningless because it was their intent and Well, it's legally meaningless. I will go that far. And we know that it was Intel's intent because on February 14th, Intel was the one who was ready to close this deal. 37 Celsius wasn't. Before I move on from the Type 2 issue, it's not just that Intel assumed no obligation to negotiate a final agreement. It expressly reserved its right to terminate the term sheet after only two days. Also, in the confidentiality provision, which is binding, as the Court was discussing earlier with my colleague, it states that the NDA would continue in full force and effect. Giving full force and effect to the NDA does necessarily mean giving effect to the NDA's whole harmless provision. And in Section 9A of that provision, Intel and 37 Celsius each reserved their right to terminate the negotiations at any time and for any reason or for no reason at all. Between that and the two-day termination provision that Intel had, the term sheet had easy off-ramps that are not present in any of the cases that 37 Celsius relies on. No court has ever made a Type 2 preliminary agreement out of a preliminary document that in this fashion allowed the parties to walk away almost immediately and, in addition, included no binding obligation to negotiate a final agreement. For the purposes of the appeal, and for the appeal only and for the summary judgment motion, is Intel admitting that CARE and its agents violated the exclusivity provision? So, Your Honor, of course, I think you're referring to emails, a few emails amongst CARE employees, not Intel employees. We, of course, don't concede that those communications rose to the level of a breach, but for purposes of this appeal, the court can assume that there was some breach of the term sheet's exclusivity provision between February 1st and February 14th, which is before Intel issued its notice. And, of course, it is undisputed that on February 14th, regardless of what had or had not happened before, what CARE employees said in emails, Intel tried to close the transaction with 37 Celsius. I also disagree with the characterization that there is any dispute in the record as to whether 37 Celsius had or one day would have had the money to close the deal with Intel. 37 Celsius did not have the $12 million that it needed when Intel tried to close the transaction. It also did not have the money later. When Intel sold CARE to iSEED on March 1st, 37 Celsius had known for two weeks that it was in a race with iSEED because the record shows that 37 Celsius knew full well that Intel was negotiating with another party, not exclusively with 37 Celsius. And after those two weeks, 37 Celsius was not even trying to raise the $12 million that the term sheet called for as the undisputed facts showed it had turned to asking Intel to agree to a completely different deal than what was described in the term sheet under which 37 Celsius would have brought only $6.5 million in cash to the closing and 37 Celsius wanted CARE to go out and borrow millions of dollars from a third-party lender that 37 Celsius was connecting with CARE in order to access the millions of dollars of capital that 37 Celsius was no longer even planning to bring to the table. So it is undisputed that 37 Celsius did not have the $12 million and wasn't even trying to get it on March 1st when Intel sold CARE to a party that did have the money and there is nothing but speculation in the record to suggest that 37 Celsius ever would have had the $12 million. All there is is written testimony from Alexander Cappy that he believes that he could have gotten the money together at some point accounting for his personal funds. That does not suffice to survive summary judgment, nor did Intel, even assuming that 37 Celsius had been right in how it characterized the term sheet. Intel, in any event, because of the termination provision, had no obligation under any circumstances to wait and wait for 37 Celsius to finally cobble together the money that it had told Intel it had at the outset. I'd like to address the NDA in the last two minutes I have. The plain text of Section 9B in the Hold Harmless provision applies here because it bars Intel's potential liability for lost profits in connection with not moving forward to a conclusion of the negotiations with 37 Celsius. And nothing in the term sheet prevents that plain text from being enforced. 37 Celsius told the District Court in its summary judgment filings in 2024 that the NDA was incorporated into the term sheet, but we don't even need the NDA to be incorporated into the term sheet. The NDA is its own freestanding contract. We just need its plain text to be enforced. And nothing in the term sheet tells the Court to do otherwise because nowhere in the term sheet did 37 Celsius and Intel agree to authorize the damages that they had waived only two weeks before, when 37 Celsius signed the NDA. And instead of trying to undo any part of the NDA in the term sheet, the parties agreed that the NDA would continue again in full force and effect, which would be very much the wrong language to use if the parties had wanted to repeal part of the NDA while allowing only its confidentiality provisions to take effect. 37 Celsius' arguments, they cannot be reconciled with the full force and effect language in the term sheet, and more importantly, they cannot be reconciled with the no circumstances, the under no circumstances language in Section 9b of the NDA, which makes it very clear that the parties were not talking about waiving damages solely for breach of the NDA. They agreed to waive the damages that they described under any circumstances. I've reached the end of my time. I'm happy to answer other questions if there are any. Thank you, Counsel. And I ask this Court to affirm. Thank you very much. Mr. Grayhead, I'll give you four minutes. Thank you, Your Honor. I would like to return to the SIGA decision, specifically the obligation to negotiate in good faith. SIGA states that an express contractual obligation to negotiate in good faith is binding. Subsequent Delaware court decisions, Cox, Green Tech Consultancy Company, make clear that this doesn't require the use of the terms good faith. You need to expressly agree to negotiate, or in this case, negotiate exclusively. Parties can state that agreement in various ways. The good faith part doesn't need to be said in those words. In that sense, it's implied. But the agreement to negotiate within an agreed framework, like the parties had here, is expressly laid out in a term sheet or a letter of intent. That agreement is not implied. This is separate from implied covenants. The duty or the covenant to negotiate is express. And in that sense, every single type two agreement carries with it the obligation to negotiate in good faith. Regarding the NDA and its hold harmless clause, I would like to return again to the fact that the term sheet signed between the parties only references it in the confidentiality section. A plain and rational reading of the NDA only extends the NDA to private or privileged information. What is a nondisclosure agreement other than an agreement not to disclose private or privileged information? So when the term sheet references that NDA within its confidentiality section, it's merely agreeing that this agreement is confidential. This agreement is subject to the NDA. But it doesn't incorporate all of the limits of liability or all of the other terms into the NDA. If, for example, Intel and 37 Celsius were to agree on a final transaction and it stated that it was still subject to the NDA, the NDA would then prohibit all damages under that scenario. The term sheet here expressly incorporates an obligation to negotiate in good faith. That obligation extends to the exclusivity clause between the parties where the parties agreed to exclusively negotiate with each other and Intel specifically agreed not to come to a final transaction with another party that would prohibit it from closing on 37 Celsius. And I think it's also important to note from my colleague's argument that there's a distinction here between a Type I and a Type II agreement. The hold harmless clause, even if it were incorporated, which it is not, but even if it were, it limits itself between 37 Celsius and Intel upon the completion of a final transaction. This is a Type II agreement. We're talking about the obligation to negotiate in good faith, not the closing of the final agreement. Here this Court should reverse and remand based on the fact that this is a Type II agreement that carries an obligation to negotiate in good faith. Intel breached that obligation to negotiate in good faith. It also breached the exclusivity clause under the exclusivity provision in agreeing or negotiating to a deal with iSEED and then finally the final transaction on March 1st with iSEED. We'd ask that you reverse and remand for a further factual finding that 37 Celsius could have closed on this deal and that expectation damages are available. Thank you, Counsel. The case will be taken under advisement.